**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| AUGUSTINE A. ONYEKA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-10-5102 |
| | § | |
| CVS CAREMARK CORPORATION, *et al*., | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

The plaintiff, Augustine "Austin" Onyeka, worked as a pharmacy technician for CVS. In this lawsuit, he alleges that CVS discriminated against him on the basis of his race (black) and national origin (Nigerian), and retaliated against him for complaining about discrimination. He asserts claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and 42 U.S.C. § 1981. After discovery, CVS moved for summary judgment with supporting evidence. (Docket Entry No. 21). The plaintiff has not responded. Based on a careful review of the pleadings, the motion, the record evidence, and the applicable law, this court concludes that there is no genuine dispute of any material fact and that CVS is entitled to judgment as a matter of law. Final judgment is entered by separate order. The reasons are set out below.

## I. Background

On August 1, 2004, CVS acquired the Eckerd pharmacy chain. Onyeka became a CVS pharmacy technician. Onyeka's job responsibilities included facilitating customers' requests to fill prescriptions, answering customers' inquiries, and assisting pharmacists on duty.

In July 2008, an African-American staff pharmacist at Onyeka's store counseled Onyeka for acting inappropriately with customers and coworkers. In one instance, he had ridiculed a female

customer for having eight children by eight different fathers. In another instance, he had refused to speak Spanish to non-English-speaking customers (he is a fluent Spanish-speaker) and had instead insisted that they speak English in this country. Onyeka's refusal to assist Spanish-speaking customers had been raised in an anonymous call to CVS's Ethics Line on August 21, 2006. The anonymous caller reported that Onyeka's purported excuse for refusing to speak Spanish was that foreign customers are in America and should speak English.

On October 27, 2008, Onyeka faxed a letter dated October 5, 2008 to CVS's human resources department complaining for the first time that the pharmacist had subjected him to harassment, discrimination, and intimidation by referring to him as a "lazy African" in the presence of other employees. Onyeka accused the pharmacist of displaying pornographic images on her cell phone to members of the pharmacy staff. In the same letter, Onyeka complained that he had not received a salary increase in three years. A "Human Resources Business Partner," Todd Hine, investigated. He concluded that the pharmacist had not called Onyeka a "lazy African," harassed him, or discriminated against him. Hine also concluded that the pharmacist had shown sexually explicit photos to one other pharmacy employee. CVS terminated the pharmacist for misconduct on November 11, 2008.

Hine's investigation also confirmed that Onyeka had not received a merit increase for three years. The pharmacist-in-charge, Kathleen Cooper, who is African-American, had given Onyeka a "meets expectations" evaluation in 2008 but had not submitted an annual evaluation for Onyeka in 2006 or 2007 and had not entered merit increases for him in 2006, 2007, or 2008. CVS corrected this by providing Onyeka with a 6.3% increase in his salary to account for a 2.1% increase in salary for each of the three preceding years.

Before the pharmacist who had been the subject of Onyeka's complaint was fired, she told Hine that she felt that Onyeka had not been effectively supervised and should have been disciplined for poor performance. CVS hired Laronda Walter, who is African-American, as a pharmacist on October 28, 2008. The evidence shows that Walter did discipline Onyeka for performance problems.

On December 4, 2008, Walter issued Onyeka a "coaching and counseling" for being combative with customers. The counseling noted: "Austin [Onyeka] does not always seek to help customers in a manner that is due service to customers. (1) Finding doctors names. (2) Finding whereabouts of scripts. (3) Speaking in tones to customers that is offensive. Since I have been employed @ CVS . . ., there have been general (at least 4) complaints directly to me about Austin's behavior [and] attitude of unwillingness to be helpful. These actions [have] lead to customer outburst, frustration [and] fury. This behavior is counter-productive to our service mission." (Docket Entry No. 21-6, at 9). On the same date, Walter issued Onyeka a coaching and counseling for poor team work, time management, and productivity deficiency. The report stated, in part: "Employee continues to get behind in work production. Austin finds it difficult to work drop-off [and] keep up with queue even in *off peak* times alone and with other employees at work." (*Id.* at 12). A third coaching and counseling issued on December 4 was for insubordination. Walters noted: "Employee did not answer three times when asked what tasks he was performing. When he finally answered, he answered in disgust. On the same day, I asked Austin to look in a particular place for script for pick-up. He was argumentative and said he had looked there already. I asked him to look again. He repeated he looked already. I knew it was there [because] I had just checked it [and] put it in the away bin. All this happened in front of customers. I just waited. [At] that point

he finally looked again [and] it was there. These acts cause tensions in the pharmacy, shuts down teamwork and dis-service [sic] customers." (*Id*. at 15).

On February 13, 2009, Walter issued Onyeka a coaching and counseling for insubordination. Walter noted that Onyeka "disrupts the workflow when he does not follow instructions," and warned Onyeka that he faced termination as a potential consequence of failing to improve. (*Id.* at 17). On February 17, Walter issued Onyeka a coaching and counseling for arriving to work over three hours late. The coaching and counseling identified "pending termination" as a potential consequence if Onyeka failed to improve his performance. (*Id*. at 19).

The record evidence shows that on April 29, 2009, Pharmacy Supervisor Amy Beyer issued Onyeka a "final job in jeopardy" warning and counseling for failing to follow directions from his supervisor, failing to arrive on time for his scheduled shifts, failing to complete his job tasks in an efficient manner, and failing to treat customers in a friendly manner. (*Id.* at 21). This coaching warned Onyeka that he faced termination if his performance did not improve. On June 3, 2009, CVS issued Onyeka an annual performance review that rated him as needing improvement. (*Id*. at 31). In the evaluation, Walter noted that she had received negative customer feedback about Onyeka and identified the organization, teamwork, customer service, dependability, and reduction of errors in typing prescriptions as areas needing improvement. (*Id.* at 31–32).

On June 17, Walter issued Onyeka three coaching and counseling warnings. The first was for failing to perform items in a timely manner. Walter noted that Onyeka was expected to complete all assignments within his scheduled shift and that overtime and time-clock violations would not be tolerated. Finally, she warned Onyeka that continued poor performance would lead to termination. (*Id*. at 34).

On the same date, Walters issued Onyeka a second coaching and counseling, this one for poor behavior and insensitivity toward a customer. Walter documented a May 29 incident in which Onyeka told a customer that another customer's prescription was none of her business. This customer was upset to the point of tears and complained about Onyeka to an assistant store manager. In the same coaching, Walter documented another customer complaint that she witnessed. Walter wrote that Onyeka told the customer at the prescription drop-off that the customer did not have a prescription and "became combative with the customer. [Onyeka] did not get the pharmacist, call the doctor or [take] any action to help customer. Then I took that customer [and] call[ed] the doctor for [the prescription]. When attending the next client in line, when couldn't find her [prescription], she wanted a pen to write [the] prescription down. She then came to me to give her list of [prescriptions]. [Onyeka] yelled across the pharmacy for customer to bring his pen back. [Onyeka] does not see the consequences of his actions. Consistent complaints are due to his insensitivities to the clients we serve." (*Id*. at 36–37).

Finally, Walter issued Onyeka a third coaching and counseling on June 17 for insubordination because he had switched his schedule with a another employee without first getting his supervisor's approval. The coaching and counseling again warned Onyeka that he faced termination. (*Id*. at 39).

On June 23, 2009, Onyeka came to work several hours late, without calling. (Docket Entry No. 21-7, at 4). When Onyeka arrived at work, Walter told him that he would be suspended, with pay, until a determination could be made about his failure to call in or report to work at his scheduled time. During his suspension, Onyeka sent a letter to CVS's human resources department alleging that Walter and Beyer discriminated against him because of his national origin. (*Id*. at 7–9).

CVS did not receive the letter until July 2, when it was faxed. Beyer had been investigating the events that led to Onyeka's suspension and what the next steps should be. On July 7, 2009, Beyer interviewed Onyeka. Onyeka claimed that he thought he was scheduled to work from 4:00 p.m. to 10:00 p.m., but that he had not checked the schedule during his prior shift, despite the fact that it was his responsibility to do so. Beyer ultimately determined that given the months of warnings without improvement, Onyeka could not demonstrate to CVS that he was capable of adequately performing his duties. CVS terminated Onyeka's employment on July 9, 2009. Onyeka filed a charge of discrimination with the EEOC on July 6, 2009, three days before his employment termination. However, CVS was not issued notice of the charge until July 15, 2009, six days after the termination. Onyeka timely sued after receiving his notice of right to do so.

## II. The Legal Standards

### A. Summary Judgment

"Summary judgment is appropriate when the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Breaux v. Halliburton Energy Servs*., 562 F.3d 358, 364 (5th Cir.2009) (internal quotation marks omitted). If the movant satisfies his initial burden of demonstrating the absence of a material fact issue, then "'the non-movant must identify specific evidence in the summary judgment record demonstrating that there is a material fact issue concerning the essential elements of [his] case for which [he] will bear the burden of proof at trial.'" *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc) (quoting *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994)). This court must take all the facts and evidence in the light most favorable to Onyeka. *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010) (per

curiam).

**B. The Discrimination Claims**

Title VII prohibits an employer from "fail[ing] or refus[ing] to hire or . . . discharg[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Without direct evidence of discrimination, a plaintiff can rely on circumstantial evidence. *Rutherford v. Harris Cnty.*, 197 F.3d 173, 180 n. 4 (5th Cir.1999). To make a *prima facie* showing of disparate treatment based on race or national origin, a plaintiff must show (1) membership in a protected class, (2) that he was qualified for the position, (3) that he was subject to an adverse employment action, and (4) that he was treated less favorably than was a similarly situated employee outside the protected class. *Black v. Pan Am. Labs., L.L.C.*, 646 F.3d 254, 259 (5th Cir. 2011). If the plaintiff makes this showing, the inference of intentional discrimination is raised, and the burden of production shifts to the employer to offer a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* The employer's burden is one of production, not persuasion, and does not involve a credibility assessment. *Id.* If the employer provides such a reason, then the inference drops out and the burden shifts back to the employee to demonstrate that the employer's explanation is merely a pretext for racial bias. *Id.*; *see also Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–56 (1981). To show pretext, plaintiff must rebut the nondiscriminatory reason with "substantial evidence." *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). The plaintiff alternatively may show "that the defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic (mixed-motive[s] alternative)." *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th

Cir. 2004) (alteration in original); *see also Smith v. Xerox Corp.*, 602 F.3d 320, 326 (5th Cir. 2010). Under the pretext alternative, the plaintiff "bears the ultimate burden of proving that the employer's proffered reason is not true but instead is a pretext for the real discriminatory . . . purpose. To carry this burden, the plaintiff must rebut each nondiscriminatory . . . reason articulated by the employer." *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007). Under the mixed-motive alternative, if the plaintiff shows that the plaintiff's protected characteristic was a motivating factor, then the burden shifts to the employer to show that the adverse employment decision would have been made regardless of the characteristic. *Rachid*, 376 F.3d at 312; *Black*, 646 F.3d at 259. This is the same standard used to analyze claims of disparate impact discrimination brought under § 1981. *Payne v. Travenol Labs., Inc.*, 673 F.2d 798, 818 (5th Cir.1982); *compare Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009) (setting out the elements of a *prima facie* case under Title VII), *with Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004) (setting out the elements of a *prima facie* case under § 1981).

"To present a prima facie case of retaliation under either Title VII or § 1981, a plaintiff must show that: (1) he engaged in an activity protected by Title VII; (2) he was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action." *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004). Complaining to supervisors about racial discrimination or harassment is a protected activity. *See Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427–28 (5th Cir. 2000) ("Under Title VII, an employee has engaged in protected activity if he or she has (1) 'opposed any practice made an unlawful employment practice by this subchapter,' or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'"

(quoting 42 U.S.C. § 2000e-3(a))); *Carrera v. Commercial Coating Servs. Int'l,* 422 F. App'x 334, 339 (5th Cir. 2011). To survive summary judgment on the retaliation claim, Onyeka must raise a genuine issue of material fact that the defendant unlawfully terminated his employment as retaliation for complaining about discrimination on the basis of race and national origin. Close timing between a plaintiff's protected activity and alleged retaliatory action may help establish the causal connection element of a *prima facie* retaliation claim. *Swanson v. Gen. Servs. Admin*., 110 F.3d 1180, 1188 (5th Cir. 1997). But summary judgment for the defendant is proper when the plaintiff presents "no evidence of retaliation save temporal proximity" to rebut the defendant's proffered reason and overwhelming evidence that plaintiff was fired because of poor performance and improper work conduct. *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007).

## III. Analysis

### A. The Discrimination Claims

The evidence shows an extensive, extended, and extensively documented history of performance problems that were not rectified. On this record, Onyeka cannot meet the requirements for a *prima facie* showing of discriminatory discipline in the coachings he received or in the decision to terminate his employment. There is no evidence that he was replaced by someone outside his protected class or that someone who was similarly situated was treated more favorably. There is no evidence that Onyeka was treated less favorably than non-black or non-Nigerian employees under "nearly identical" circumstances. *Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 304 (5th Cir. 2000). Onyeka presented no evidence that CVS treated non-black or non-Nigerian employees who exhibited the same persistent performance issues more favorably. There is no evidence that after repeated warnings and documented repeated problems, other employees avoided discipline or kept

their jobs.

To the extent Onyeka relies on the evidence that he did not receive a merit increase for three years, the evidence not only shows that CVS rectified the situation but also that Onyeka was not the only employee who failed to receive timely merit increases because of administrative oversight. CVS has submitted record evidence showing that other pharmacy technicians, one who was not Nigerian and one who was neither black nor Nigerian, also failed to receive a merit increase after Cooper failed to submit the necessary information.

Even assuming that Onyeka had made a *prima facie* showing of discriminatory disparate treatment, CVS provided substantial evidence to show that its proffered reasons for the warnings and the job termination were neither pretextual nor motivated by discriminatory animus. On this record, Onyeka's subjective belief that he was the target of discrimination cannot overcome the extensive evidence that he was disciplined and fired because of performance issues, after numerous warnings and opportunities to improve. There is no basis for an inference of discrimination. Summary judgment is granted as to this claim.

**B. The Retaliation Claims**

Onyeka appears to assert that Beyer ordered Walter to issue the multiple written coachings and counselings between December 2008 and July 2009 in retaliation for Onyeka's October 2008 complaint against the pharmacist who was herself fired after Onyeka's complaint. The evidence of that complaint shows that Onyeka did not voice any criticism of either Beyer or Walter, who was not hired by CVS until October 28, 2008. And Onyeka continued working for CVS until June 2009. Neither the sequence of events nor the timeline supports Onyeka's retaliation claim. The law is clear that speculation alone is insufficient to raise a fact issue as to retaliation. *See Eberle v. Gonzales*,

240 F. App'x 622, 629 (5th Cir. 2007) (stating that the appellant's "subjective belief that he was retaliated against, without more, is not sufficient to survive summary judgment"); *cf. Douglass*, 79 F.3d at 1429 (stating that "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden").

Onyeka also argues that CVS terminated his employment in retaliation for the letter dated June 30, 2009—that CVS received via fax on July 2, 2009—in which he claimed Beyer and Walter discriminated against him on the basis of his race and national origin. The timetable defeats Onyeka's claim. CVS has submitted record evidence showing that Onyeka was suspended on June 23, 2009—seven days before Onyeka sent his letter to CVS. Further, it is undisputed that Onyeka had been issued multiple coachings and counselings and a "job in jeopardy" warning for poor performance long before he sent the letter. On this record, both the evidence of the temporal relationship between the complaint and the adverse employment action, as well as overwhelming evidence that Onyeka was fired because of poor performance and improper work conduct, support summary judgment dismissing the retaliation claim. *See Strong*, 482 F.3d at 808.

**IV. Conclusion**

The motion for summary judgment is granted. Final judgment is entered by separate order.

SIGNED on January 17, 2012, at Houston, Texas.

Lee H. Rosenthal
United States District Judge